UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-23797-CIV-DPG

CLARENS DESROULEAUX,

      Plaintiff,

vs.

THE VILLAGE OF BISCAYNE PARK,
a municipality of the State of Florida,
CHIEF RAIMUNDO ATESIANO,
OFFICER CHARLIE DAYOUB,
OFFICER GUILLERMO RAVELO,
individually and in their official capacity.

      Defendants.

_____/

**DEFENDANTS, VILLAGE OF BISCAYNE PARK, CHARLIE DAYOUB AND
GUILLERMO RAVELO'S, CONCISE STATEMENT OF
MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

      Defendants, VILLAGE OF BISCAYNE PARK, CHARLIE DAYOUB and GUILLERMO

RAVELO, by and through undersigned counsel, pursuant to Rule 56, Fed.R.Civ.P., and Local Rule

56.1, S.D.Fla.L.R., move for summary judgment, and file this Concise Statement of Material Facts

in support, as follows:

      1.      Over a short 8-day period from January 4, 2013 through January 12, 2013, Village

of Biscayne Park residents were victimized by a string of related residential burglaries.  *Ravelo*

*Depo., pp. 16-20; C. Dayoub Depo., pp. 16-18.*  Two of the burglaries took place on January 12

just a block apart.  *C. Dayoub Depo., p. 16.*  Besides the close temporal and physical proximity,

the burglaries were committed in the same manner by entry into a window when the burglar(s)

apparently knew that no one was home.  *Ravelo Depo., pp. 18-20, 32.*  Given the location, close

time period, and consistent manner of entry, the Biscayne Park Police operated with the well-

founded belief that these burglaries were committed by the same individual(s). *Ravelo Depo., pp. 17-18; Dayoub Depo., pp. 14,17.*

2.    Cathy Turner Pyle, a 70-year-old substitute teacher and former library supervisor, was unfortunately victimized by the burglar(s). On January 12, 2013, while she was out shopping, someone made entry into her home and stole numerous items. *Pyle Depo., pp. 11, 15-17.* Prior to this time, Pyle loved the Village of Biscayne Park and felt safe there. *Id., pp. 8-9.* This burglary shook her. She promptly contacted the Biscayne Park Police Department, and met with officers (including Defendant, Guillermo Ravelo) who were polite, professional and responsive. *Id., pp. 18-20; Ravelo Depo, p.34.*

3.    Days after the burglary, while paying bills, Pyle noticed that one of her checks was missing, and notified the police. *Id., p.20.* On or about January 17, 2013, just five (5) days after the burglary, Clarens Desrouleaux attempted to deposit or cash check number 1376 from Pyle's bank account at Chase Bank. *Id., pp. 20-23; Appendix Tab 1.* A copy of a forged check made payable to **Clarens Desrouleaux** was obtained from the bank in the amount of $2,300.00. At the time, Pyle only had $2,346.97 in the account, so obviously whoever wrote the check was able to review her check register to ascertain the amount of available funds. *Id., p.23.* Pyle did not know Clarens Desrouleaux, and did not write on any portion of the stolen forged check made payable to him. *Id., pp. 26-30.*

4.    At the time that Officer Guillermo Ravelo learned of and received a copy of the stolen check, he had no prior issues with, and had never heard or met Clarens Desrouleaux. *Ravelo Depo., p. 39.* Officer Charlie Dayoub, who later rendered assistance in detaining Desrouleaux, similarly had no prior knowledge or interaction with him. *Dayoub Depo., p.22.* Contrary to the allegations of the pleadings, Desrouleaux was not randomly selected or targeted because of his

2

race; instead, ***he was the named payee on a forged $2,300 check that had just been stolen from a Biscayne Park resident days earlier.***  *Id.*

5.     After receiving a copy of the stolen check *(Appendix Tab 1),* Officers Ravelo and Dayoub accessed the Florida Driver and Vehicle Information Database (DAVID) to obtain a photograph and signature exemplar of the forged named payee, Clarens Desrouleaux.  *Ravelo Depo., pp. 39-41; Dayoub Depo., pp. 23-25.*  When they viewed the DAVID signature side-by-side with the handwriting on the check, including the signature endorsement on the back, they both concluded that the writing was virtually identical.  *Ravelo Depo., p.42-46; Dayoub Depo., pp. 25-26.  Compare Appendix Tab 1 with Tab 2; see also composite of signatures authenticated by Plaintiff as Exhibits 1 through 6 of his deposition, Appendix Tab 8; Desrouleaux Depo., pp. 160-64.*

6.     Officer Ravelo noted that the writing was distinctive because Desrouleaux prints his signature and makes unusual use of printed capital letters.  It was apparent to him that Desrouleaux, based upon viewing his signature on file with the State, was the person that wrote on the check.  *Ravelo Depo., p. 42.*  Similarly, Officer Dayoub observed that the block printing of the signature was unusual and distinctive, and that the writing on the check when compared to the signature of Clarens Desrouleaux on file with DAVID was "practically identical."  *Dayoub Depo., pp. 25-27.*  Officers Dayoub and Ravelo were not alone in reaching this conclusion.  The Miami-Dade County criminal court Judge who presided over the case of <u>State v. Desrouleaux</u> made the same observations as to the matching signatures.  At a May 21, 2013 suppression hearing, Judge Stacy Glick commented:

> I've had the opportunity to review the motion and heard the testimony of the arresting officer.  I've reviewed the pieces of evidence that you provided, State's Exhibit 1, State's Exhibit 2, State's Exhibit 3.  And I'm looking at the signatures from DAVID

> and it's almost identical to the one on the checks that were allegedly cashed on the front and the back and it's kind of funny, normally you see, you know, signatures cursive, but Mr. Desrouleaux appears to use the same print.  And based on the fact that they're so similar in nature, I do believe that officer had probable cause to stop, so motion is denied.

*Appendix Tab 3, p. 31.*

7.    With this forged check, the Biscayne Park Police Department now had their first lead, and the plan was to locate Clarens Desrouleaux in order to question him.  *Ravelo Depo., p.46; Dayoub Depo., pp. 18, 29.*  Officer Dayoub believed that Desrouleaux was the likely burglar, but at a minimum that he was involved with uttering a forged instrument, an independent arrestable offense.  *Id., p. 30.*

8.    Along with a supervisor, Officers Dayoub and Ravelo traveled to Miami and encountered Desrouleaux walking outside to a car.  Desrouleaux peacefully went with the officers to the Biscayne Park Police Department to answer questions, still not under arrest.  *Desrouleaux Depo., pp. 80-82; Ravelo Depo., pp. 49-50; Dayoub Depo., p. 34.*

9.    Desrouleaux's deposition testimony, at this point, diverges with his own pleadings. Desrouleaux alleged in his pleadings that he confessed to committing the burglaries in order to receive a more lenient sentence.  *See, D.E. 1, ¶16; D.E. 8, ¶17; D.E. 17, ¶19; D.E. 65, ¶59.*  In his deposition, in one of many examples where Plaintiff struggled with the truth, Desrouleaux refuted his own allegations, now claiming that he did not confess at all.  *Desrouleaux Depo., pp. 85, 98.* He even went so far as to assert, for the very first time, that he was subjected to force by being hit with a book, a claim not found anywhere within any of his pleadings or detailed interrogatory answers.  *Appendix Tab 4.*

10.    Based upon the evidence, including a signature on the check that matched Desrouleaux's handwriting and signature, he was arrested.  *Dayoub Depo., p.30.*  Consistent with

Plaintiff's allegations that he confessed to receive a more lenient sentence, Plaintiff cooperated with authorities since the evidence, at this point, was extremely compelling in light of the handwriting on the check, made payable to Clarens Desrouleaux, matching Plaintiff's handwriting and signature. (D.E. 1, ¶16); *Dayoub Depo, pp. 38-40; Ravelo Depo., pp. 53-55.*    Not only did Plaintiff fail to offer any credible explanation as to how his handwriting and name appeared on a stolen forged check, but in addition could not explain how that very check was ***deposited into his bank account at his very branch, North Miami.   Only Clarens Desrouleaux had the ability to deposit and withdraw funds from that account.***   *Desrouleaux Depo., pp. 45, 58; Reid Depo., pp. 9-17.*

11.     The obviously false and wholly incredible statement offered by Plaintiff in his deposition was similar to that given to the police, and was thus properly rejected by law enforcement as not worthy of credence.  It provided no reason to forego an arrest.  Plaintiff told the police that some guy with a nickname – someone whose name he did not know – was the real burglar and check forger.  *Ravelo Depo., p. 54; Dayoub Depo., p. 39.*  This already tall tale grew to a massive, gargantuan size when Plaintiff gave deposition testimony in this action.  *Desrouleaux Depo., pp. 40-64.*  Plaintiff's fictional account is summarized below.

12.     According to Desrouleaux, he opened a bank account, but did not put money in it.  *Id., p.55.*  A guy named "Brunette" who he knew from the streets came up to him, without solicitation, and they had the following discussion: "say, man, you, you want to put – you want to make some money?  I say, what kind?  He say, I want to put a check under your name.  I say, no, you ain't going to put that check under my name.  I ain't going to jail for that, and he left."  *Id, pp. 43-44.*

13.     After this conversation, according to Plaintiff, "Brunette" somehow developed amazing, superhuman prescient powers.  "Brunette" was able to locate Plaintiff's girlfriend's vehicle even though it was not parked in its usual place, somehow know that Plaintiff left his bank card in the glove compartment (when Plaintiff testified he would not normally keep his bank card in the car except that he forgot that day, *Id, p.54*), and that Plaintiff ***incredibly*** wrote his ATM pin number on an envelope, and kept that confidential pin number with the actual bank card in the car, something which every account holder would know never to do.  *Id., pp. 45-64*.  "Brunette" must have been a criminal mastermind because he ascertained all of this information without being told. He purportedly smashed out the window, stole the bank card, procured the pin number (despite Plaintiff never revealing it to him), and then had the special talent to forge the check in handwriting so identical to Plaintiff that two law enforcement officers and a Miami-Dade County Circuit Court Judge reasonably believed the writing to belong to Desrouleaux. [1]

14.     The outlandish fiction does not end there: "Brunette" then supposedly deposited the check into Desrouleaux's bank account, without proper identification, at Desrouleaux's very bank branch in North Miami, in a calculated scheme to then withdraw $2,300 from that same account without proper identification.  *Id.; see also, Deposition of TD Bank Head Teller, Isheca Reid, pp. 9-17* (affirming that check cannot deposited without an account; the bank checks identification; that subject check was, in fact, deposited by the account holder, Clarens Desrouleaux; that the subject check was endorsed by TD Bank account holder, Clarens Desrouleaux; that a deposit slip was required; and that only Clarens Desrouleaux could withdraw the funds, and that "Brunette" would be unable to withdraw funds).

---

[1] Plaintiff could offer no explanation as to how "Brunette" could so closely imitate Plaintiff's handwriting and signature.  He had never shown "Brunette" how to sign his name.  *Desrouleaux Depo., p.64*.

15.     The fictional account continues: Plaintiff did not report his bank card stolen.  He did not report that the window on the car was broken, or that the vehicle was broken into for one reason: ***he did not have the time.***  *Desrouleaux Depo., pp. 46-47.*  He apparently though did have time to take the vehicle to an unknown repair shop, and have the window fixed.  *Id., pp. 53-54.* Of course, as with not knowing the name of "Brunette," Plaintiff cannot recall where the vehicle was fixed except a general location on 119th Street, and no documentation exists to support that a window was ever broken or repaired.  *Id.*

16.     Predictably, any rational law enforcement officer – and for that matter, any rational human being – rejected Plaintiff's version of events as unworthy of any credence.  He was arrested based upon the forged stolen check being deposited into his account (along with his confession), charged and the State Attorney pursued prosecution given the compelling evidence.  *Ravelo Depo., p. 60; Dayoub Depo., p.48.*  After the Honorable Stacy Glick denied the motion to suppress, while expressly finding that it was apparent that Clarens Desrouleaux forged the check, Plaintiff pled guilty, and was sentenced to only five (5) years despite that he was facing thirty-five (35) years as a habitual offender.  *Desrouleax Depo., pp. 99-100; Answer to Interrogatory, #17, Appendix Tab 4.*

17.     Clarens Desrouleaux is a habitual offender because since his arrival in the United States from Haiti as resident, he has been a career criminal, repeatedly victimizing the community.  He has been convicted of numerous drug offenses, including selling crack cocaine, and kidnapping, among other offenses.  *Desrouleaux Depo., pp. 19-28, 32; see also Florida Department of Law Enforcement Criminal History, Appendix, Tab 5.*  He had numerous deportable offenses pre-dating the arrest at issue in this case.  *See Declaration/Report of Richard Jurgens,*

*Appendix Tab 6.* Even without the subject arrests by the Village of Biscayne Park, he is ineligible to return to the United States. *Id.*

18.    The two individual law enforcement officer defendants, Charlie Dayoub and Guillermo Ravelo, admittedly have had their own issues with the law. Dayoub has a single misdemeanor conviction. *C. Dayoub, p.11.* Ravelo is serving prison time for felony convictions. It is critically important though that neither of their guilty pleas involve any misconduct, whatsoever, as to this Plaintiff, Clarens Desrouleaux, and their sentences are wholly unrelated to any issues in this case. *Ravelo Depo., pp. 13-15, 176; Dayoub Depo., pp. 10-14.* Both officers have admitted their wrongdoing against others, signed plea proffers, cooperated with the government and accepted their sentences. *Id.* In turn, the U.S. Government has accepted their pleas without any admission of wrongdoing as to Clarens Desrouleaux. *Id.; see also Plea Proffers for Ravelo and Dayoub, Appendix Tab 7* (listing initials of all individuals whom they pled guilty to committing wrongs against, which do not include Clarens Desrouleaux).

19.    The Federal Bureau of Investigation examined the case of Clarens Desrouleaux and determined that probable cause existed, and that no charges would be brought as a result of his arrest. *Ravelo Depo., p. 62.* Defendants were never given a directive to falsely charge Clarens Desrouleaux with burglaries he did not commit. *Ravelo Depo., pp. 117, 142.* No other suspects have ever been developed for these burglaries. *Dayoub Depo., p. 41.*

20.    Ravelo and Dayoub had sufficient probable cause to arrest and charge Desrouleaux with committing crimes in relation to these burglaries, as well as for uttering a forged instrument by depositing a stolen forged check into his bank account. This probable cause exists with or without Desrouleaux's confession to the police, and later confession/guilty plea in the criminal

matter pending before Judge Glick. *Id.; Dayoub Depo., pp. 30-31.* Both officers stand by their probable cause determinations. *Dayoub Depo., p.49; Ravelo Depo., p. 59; Gaut Expert Report.*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on this 16th day of September, 2019, we electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. We further certify that we either mailed the foregoing document and the Notice of Electronic Filing by first class mail or by electronic mail to any non CM/ECF participants and/or the foregoing document was served via transmission of Notice of Electronic Filing generated by CM/ECF to any and all active CM/ECF participants.

JOHNSON, ANSELMO, MURDOCH, BURKE, PIPER & HOCHMAN, P.A.
Attorneys for Village of Biscayne Park
2455 East Sunrise Boulevard -Suite 1000
Fort Lauderdale, Florida 33304
(954) 463-0100 - Telephone
(954) 463-2444 - Facsimile

By: */s/ Scott D. Alexander*
        E. BRUCE JOHNSON, FBN 262137
        SCOTT D. ALEXANDER,
        FBN 057207

STEPHANIE DEUTSCH, P.A.
Attorney for Charlie Dayoub and Guillermo Ravelo
1875 NW Corporate Blvd., Suite 100
Boca Raton, FL 33431
Telephone:    (561) 826-2800
Facsimile:    (561) 826-2828

BY:    */s/ Stephanie Deutsch*
        STEPHANIE DEUTSCH, FBN 503584

## SERVICE LIST

**Counsel for Plaintiff**:
Sagi Shaked, Esq.
SHAKED LAW FIRM, P.A.
2875 NE 191ST Street
Aventura, FL 33180
filingcourtdocuments@gmail.com
shakedeservice@gmail.com
(305) 937-0191 (Phone)
(305) 937-0193 (Fax)

**Attorney for Raimundo Atesiano:**
Oscar E. Marrero, Esq.
MARRERO & WYDLER
2600 Douglas Road, PH-4
Coral Gables, FL 33134
oem@marrerolegal.com
dinah@marrerolegal.com
Guertty@marrerolegal.com
(305) 446-5528 - Telephone
(305) 446-0995 - Facsimile

**Attorney for Officers Dayoub and Ravelo:**
Stephanie Deutsch, Esq.
Stephanie Deutsch PA
1875 NW Corporate Blvd., Suite 100
Boca Raton, FL 33431
561) 826-2800 - Telephone
(561) 826-2828 - Facsimile
sdeutsch@scdlaw.net
twolosh@scdlaw.net

**Attorneys for Village of Biscayne Park:**
E. Bruce Johnson, Esq.
Scott D. Alexander, Esq.
JOHNSON, ANSELMO, MURDOCH,
BURKE, PIPER & HOCHMAN, PA
2455 E. Sunrise Blvd., Suite 1000
Fort Lauderdale, FL 33304
(954) 463-0100 (Phone)
(954) 463-2444 (Fax)
alexander@jambg.com
johnson@jambg.com
young@jambg.com